[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15499
_____

D. C. Docket No. 3:09-00080-MCR-CJK

MORTGAGE NOW, INC.,

Plaintiff-Appellee,

versus

GUARANTEED HOME MORTGAGE
COMPANY, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(October 21, 2013)

Before PRYOR and BLACK, Circuit Judges, and RESTANI,[*] Judge.

PER CURIAM:

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

Appellant Guaranteed Home Mortgage Company, Inc. (Guaranteed), and Appellee Mortgage Now, Inc. (MNI) are competing mortgage companies. In February 2009, MNI's Destin, Florida, branch manager, Bryan Stone, left MNI's employment to work for Guaranteed, taking 12 MNI employees with him. MNI brought a lawsuit alleging that Guaranteed and former employees Stone and Phillip Heppding engaged in tortious and disloyal conduct which caused irreparable harm and damages for MNI.[1] Specifically, MNI alleged that while Stone and Heppding were still employees of MNI, they solicited MNI employees and customers in anticipation of their employment with Guaranteed, and that Guaranteed and Stone conspired to interfere with MNI's business relations.

Following a six-day bench trial, the district court concluded that Stone and Guaranteed tortiously interfered with MNI's business relationships and joined in a civil conspiracy together for this purpose. The district court then awarded MNI $280,261.44 in lost profit damages. On appeal, Guaranteed argues the district court erred in (1) concluding it and Stone conspired to intentionally interfere with MNI's business relations; (2) finding Guaranteed's conduct proximately caused MNI's reduced loan production, and (3) awarding MNI lost profit damages. After

---

[1] Stone and Heppding are not involved in this appeal.

review[2] of the record and the parties' briefs, as well as the benefit of oral argument, we affirm the district court's well-reasoned order.

## I.  CONSPIRACY TO INTENTIONALLY INTERFERE IN BUSINESS RELATIONS

Guaranteed contends the district court erred in determining that MNI proved all the elements of its claim for intentional interference with business relations under Florida law.  Guaranteed first asserts the district court misstated the elements of the tort.  Under Florida law,

> [t]he elements of tortious interference with a business relationship are (1) The existence of a business relationship . . . (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1995) (quotation omitted).  In paraphrasing this standard, the district court stated the fourth element as "that the defendants' interference resulted in damages to the plaintiff."  Even assuming the district court should have used the word "breach" in the standard (as Guaranteed argues), the district court's findings support that Guaranteed's conduct resulted in a breach of relationship between MNI and its employees and customers.

---

[2] On appeal following a bench trial, we review the district court's legal conclusions *de novo* and its factual findings for clear error.  *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1282 (11th Cir. 2006).

Guaranteed next argues that its actions were not the proximate cause of employees leaving MNI. Guaranteed asserts there could be no interference with MNI's employees because they were terminable at will. Florida law allows an action when a party interferes with a contract terminable at will. *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985). Thus, the employees' at-will status does not preclude an intentional interference with contractual business relations action.

Guaranteed contends that because the employees were already predisposed to leaving MNI, it cannot be liable for inducing a breach of the relationship, and that the district court provided too lax of a standard for proximate cause. The third element of the tort of intentional interference with business relations is the causation element. *Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838 (Fla. 2d DCA 2009). "Causation requires a plaintiff to prove that the defendant manifested a specific intent to interfere with the business relationship. No liability will attach unless it is established that the defendant intended to procure a breach . . . ." *Id.* (quotation omitted). Further, if one party to a contract is already predisposed to breach, then the third party's actions cannot have induced the breach. *Farah v. Canada*, 740 So. 2d 560, 561 (5th DCA 1999).

The evidence presented at trial supports the district court's conclusion that Guaranteed's and Stone's actions intended to procure a breach of the employees'

4

relationships with MNI. The district court did not provide too lax a standard for proximate cause, and linked the conduct of Guaranteed's business development manager, Lou Tesoriero, to the breach of the employees' relationships with MNI. The evidence supports that Tesoriero and Stone intended to jump start the new Destin Guaranteed office with experienced MNI employees and ready-made business pipelines, and they acted on this agreement by signing up employees while they were still employed with MNI and encouraging those employees to take actions inconsistent with their duties toward MNI.

As to the employees being predisposed to leaving MNI, the record sufficiently shows that the employees were influenced by Stone's negative comments about MNI and its business, which generated fear, and by the prospect of having a ready-made office and loan pipeline at Guaranteed when they left MNI. Additionally, the fact that some of the employees were actually fired by MNI does not affect the proximate cause finding because the record supports that these terminations would not have occurred without Stone's and Guaranteed's actions. The employees' relationships with MNI were breached before their termination date as many of them were already considered employees of Guaranteed.

## II.  PROXIMATE CAUSE OF REDUCED LOAN PRODUCTION

Guaranteed asserts that the district court engaged in "pure speculation" that Guaranteed's and Stone's actions resulted in MNI-Destin's reduced loan production.  Florida law requires more than "speculation" to show the defendant's conduct resulted in plaintiff's damages.  *See Reaves v. Armstrong World Indus., Inc.*, 569 So. 2d 1307, 1309 (Fla. 4th DCA 1990).

The district court did not engage in mere speculation to conclude that Guaranteed's actions resulted in reduced loan production.  The evidence supports that the employees' discontent, lack of productivity, and redirected energy toward Guaranteed while they were still employed by MNI in February 2009, combined with the mass exodus of nearly half of MNI-Destin's staff reduced productivity in February through April 2009.

## III.  DAMAGES

Guaranteed contends the district court erred in allowing lost profits to be awarded under a relaxed standard, and that MNI's damages were not proven with specificity.

When a party seeks lost future profits, the party must prove that the lost profits were a direct result of the defendant's actions and that the amount of the lost profits can be established with reasonable certainty.  *James Crystal Licenses,*

6

*LLC v. Infinity Radio, Inc.*, 43 So. 3d 68, 74 (4th DCA 2010).  As to proving the

amount of damages, Florida law provides:

> Difficulty in proving damages or uncertainty as to the amount will not
> prevent recovery as long as it is clear that substantial (rather than
> merely nominal) damages were suffered as a result of the wrong, and
> the competent evidence is sufficient to satisfy the mind of a prudent,
> impartial person as to the amount.  However, an award of lost profits
> cannot be based on mere speculation and conjecture.

*Id.*

MNI compared Destin closings for the months of November 2008 through

January 2009 with February through April 2009.  The average for the preceding

three months was 33 loans closed per month, and an average of 17 loans per month

closed in the subsequent three months.  Thus, the average loan closing totals were

down by 16 closings per month.  Exhibits in evidence and the testimony of James

Marchese established the average profit per loan was $5,838.78.  This totaled lost

profits damages to MNI at $280,261.44, with 16 lost closings per month,

multiplied by the average profit per loan at $5,838.78.  The evidence presented is

sufficient to satisfy the mind of a prudent, impartial person as to the amount of lost

profits.[3]

_____

[3] While Guaranteed argues on appeal that certain overhead expenses were not deducted from this calculation, Guaranteed did not make this argument before the district court.  Thus, we do not address this argument.  *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (explaining we have "repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court" (quotation omitted)).

Accordingly, we affirm the district court's conclusion that Guaranteed and Stone conspired to intentionally interfere in MNI's contractual business relations and award of $280,261.44[4] in lost profit damages.

**AFFIRMED.**

---

[4] The district court's damages award totaled $339,468.97 with the inclusion of prejudgment interest.